The City National Bank and Trust Co., Trustee, under trust agreement with Hamilton Depositors Corporation for the benefit of holders of Hamilton Trust Shares v. Commissioner.
City Natl. Bank & Trust Co. v. Commissioner
Docket No. 106311.
United States Tax Court
1943 Tax Ct. Memo LEXIS 416; 1 T.C.M. (CCH) 765; T.C.M. (RIA) 43131; March 8, 1943
*416 Morrison Shafroth, Esq., 730 Equitable Bldg., Denver, Colo., for the petitioner. J. E. Marshall, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Petitioner challenges respondent's determination of income tax deficiency in the amounts of $2,260.15 and $3,288.09, respectively, for its fiscal years ending April 30, 1939, and April 30, 1940, and of excess-profits tax deficiency of $1,268.75 for the fiscal year ending April 30, 1939. The single question involved is whether petitioner is taxable as a trust, or as a corporation as the respondent contends. A stipulation of facts was submitted, and the following findings are made from the record and stipulation. Findings of Fact The stipulated facts are hereby found. The City National Bank & Trust Company is a Missouri corporation, with its offices at Kansas City, Missouri, and is successor trustee of the petitioner trust under a trust indenture executed on July 23, 1931. The City National Bank & Trust Company on May 31, 1941, succeeded the International Trust Company as trustee and was substituted for the International Trust Company in this proceeding by order. During the fiscal years here involved *417 the International Trust Company, a Colorado corporation, with its principal office in Denver, was trustee of petitioner trust. It filed a corporation income and excess-profits tax return for the trust for the fiscal year ending April 30, 1939, with the collector of internal revenue for the district of Colorado, but filed no such return for the fiscal year ending April 30, 1940. Fiduciary income tax returns were filed for both fiscal years with the same collector. The International Trust Company succeeded The Guardian Trust Company of Denver, Colorado, on March 10, 1934, under the original trust indenture of July 23, 1931. The parties to the trust indenture of July 23, 1931, as amended up to and including April 30, 1940, were the Hamilton Depositors Corporation, the Registered Holders from time to time of certificates known as Hamilton Trust Shares, hereinafter referred to as investors, and the International Trust Company, hereinafter referred to as trustee. The Hamilton Depositors Corporation, hereinafter referred to as the corporation, is a Delaware corporation duly authorized to do business in Colorado, having its office in Denver, Colorado. A person became an investor in the *418 trust in the following manner: An application was filed with the corporation, accompanied by the amount of the first payment. The corporation prepared a certificate and transmitted it to the trustee for authentication and for the making of a record thereof on the books of the trustee. The certificate was then returned to the corporation for entry of the certificate number and necessary details in the corporation certificate register, and for delivery to the applicant. Upon delivery to the applicant he became an investor and no other form of certificate was issued. The investor was furnished a deposit record book, in which were entered installment payments and beneficial interests in the underlying securities of the trust, which were the stocks of thirty corporations. The deposit record book of an investor making installment payments refiected only the amount of the payments made by him, unless an entry of the beneficial interests was requested. A stock unit was made up of one share of stock of each of the thirty corporations listed in the agreement. Each unit was split into approximately 1,000 beneficial interests. The corporation maintained a ledger account in the name of each investor *419 which reflected payments and beneficial interests and the balance of the account. A daily report was made by the corporation to the trustee, showing all payments received for the day, less the corporation's charges as set forth in the agreement and trust indenture. The payments were deposited by the corporation with the trustee's bank to the credit of the trustee. During the fiscal years in question the deposits were made to the credit of the trustee in an account entitled "The International Trust Company as Trustee under Agreement and Declaration of Trust of Hamilton Depositors Corporation Dated July 23, 1931, as amended or Supplemented." When stock was to be purchased the corporation issued a purchase order to the broker and sent a copy of it to the trustee with directions to pay the amount of the purchase. Confirmation of the purchase was sent by the broker in duplicate to the corporation and one copy thereof was then sent by the corporation to the trustee, together with a report of the distribution of beneficial interests with respect to the particular purchase. The necessary entries were then made on the ledger accounts mentioned above and in the deposit record book of the respective *420 investors, making the payments with which the particular purchase of stock had been made. The trustee kept a separate account in which it recorded all moneys received and disbursed by it under the terms of the agreement and trust indenture. Dividends on stock were paid to the trustee and it recorded them on its books, furnishing the corporation a monthly statement thereof. The earnings consisting of dividends, sales of fractional shares, sales of purchase warrants or rights to subscribe to securities, and sales of stock dividends declared in lieu of cash dividends, which were the only earnings, were credited (less the deductions authorized under the agreement and trust indenture) quarterly to the accounts of the investors on the books of the corporation in proportion to their beneficial interests. Each investor's interest in said earnings (less the deductions authorized under the agreement and trust indenture) was entered on the ledger sheet reflecting his account and in his deposit record book. A report of such entries was then sent by the corporation to the trustee showing the amount thereof entered in each investor's account. If the investor had so requested, he received a check *421 from the trustee at the end of each quarter for his share of these dividends or if he so desired, they might accumulate and be applied to the purchase of additional beneficial interests in the same manner as though he had made an additional payment on the account. During the fiscal years ended April 30, 1939, and April 30, 1940, sums were deposited to the credit of the trustee by the corporation, aggregating the respective amounts $712,676.67 and $630,143.38., these sums were used by the trustee to purchase stock and for conversion of beneficial interests as provided by the paragraph entitled, "liquidation", in the agreement and trust indenture. During the fiscal years involved the ownership of beneficial interests and certificates and the amounts of beneficial interests converted into cash were as follows: Year ended
Year ended
April 30, 1939
April 30, 1940
Amount of Beneficial Interests Converted into Cash
$ 96,538.00
$147,160.00
Number of Beneficial Interests
1,572,289.00
1,804,097.00
Number of Certificates Held by Investors
8,907.00
9,350.00
The method of computing beneficial interests upon the purchase of new units of underlying securities was described *422 in the prospectus issued by the corporation, dated October 19, 1939. On August 7, 1939, the corporation purchased 13 shares of each of the 30 stocks in the portfolio. The total cost of the purchase, including taxes, commissions, postage, and insurance was $23,253.84. The prospectus described the split-up of units into beneficial interests as follows: The above purchase of thirteen units at a total cost of $23,253.84 was split up into 12,202 Beneficial Interests having a value of $1.90574 each, as follows: Actual cost per unit of new purchase (excluding tax, commission, postage and insurance) was $1,779.375. Step Number 1 to ascertain value of Trust Fund, not including new purchase, based on the price paid for the new purchase: 1,716 shares of each stock at
$1,779.375
$3,053,407.50
846 extra shares of Air Re-
duction Co. at $52,875
44,732.25
38 extra shares of Std. Oil of
N.J. Co. at $40.75
1,548.50
$3,099,688.25
Step Number 2 to ascertain value of each Beneficial Interest outstanding prior to the new purchase, but based on the price paid for the new purchase: $3,099,688.25 (value of Trust Fund) divided by 1,635.179 (Beneficial Interests) equals $1.895626. Step *423 Number 3 to ascertain number of Beneficial Interests to issue against new purchase: Divided $23,131.97 by $1.895626 equals 12,202 Beneficial Interests. Step Number 4 to ascertain the price of each of the newly created Beneficial Interests: Divided $23,253.84 by 12,202 equals $1.90574. The securities in the Trust Fund on August 31st, 1939, consisted of 1,729 units, plus 846 shares of Air Reduction and 38 shares of Standard Oil of New Jersey, acquired through stock split-ups, against which there has been allocated 1,647,381 Beneficial Interests. With respect to the above procedure the trust indenture provided as follows: 15. As soon as and as often as units of the securities in the portfolio have been purchased such commitment will be split up and divided into beneficial interests by the Corporation and charged to the account of the respective Investors by the Corporation in substantially the following manner, to-wit: The initial purchase of a unit or units to be made hereunder will be divided into beneficial interests at the rate of one thousand of such interests for each unit in such purchase. When each and every purchase of units is thereafter made the market value of the said *424 beneficial interests then outstanding, prior to such purchase, will be determined by dividing the total number of beneficial interests then outstanding into the then market value of all of the stocks theretofore purchased on the day the new purchase is made. After having arrived at the market value of such beneficial interests on such date, such market value will be divided into the cost price of the new purchase to determine the number of beneficial interests to be issued against the new purchase. At each time that beneficial interests are thus created the same will be charged to each Investor at their market value as his credits used in such purchase may appear. Paragraph 18 of the trust indenture provided that - The Corporation shall also have the right at any time, whenever its Board of Directors deem it proper, to eliminate any stock of the companies from the portfolio and the exercise of such discretion upon the part of the Corporation shall in no manner hereunder or otherwise create any claim or cause of action by anyone against said corporation. There shall be no right of substitution of any other stock, but said portfolio from that time on shall consist only of the stocks *425 not eliminated and all new purchases of units shall be composed only of the stocks not eliminated. No stocks have ever been eliminated from the portfolio, and the trustee never purchased any stocks under the agreement and trust indentures other than the 30 stocks specified therein and those only in the proportion specified therein. The trustee's books of account and records have been kept on the cash receipts and disbursements basis. The trustee maintained a register of the certificate-holders showing the number of the certificates, the name and address of the holder, the face amount, and if disposed of, whether by liquidation or transfer. In addition, the trustee maintained an earnings and capital account. All earnings of securities were credited to the earnings account. The capital account had two subsidiary accounts, one of which showed the corporation's deposits with the trustee's bank, the other showing amounts withdrawn from that account and used to purchase new units of stock. The trustee kept 30 ledger cards, one for each corporate stock showing the name of the stock, the stock certificate number, how the certificates were registered, and the number of shares represented *426 by each certificate. These were all the accounts maintained by the trustee. The trustee's duties with respect to the trust were under the supervision of the vice president in charge of the trust department of the trustee. No one was employed by the trustee for the sole purpose of handling the trust and the trustee's compensation was paid by the corporation, the amount being agreed on between the trustee and the corporation. For correspondence concerning the trust, the trustee's regular company stationery was used and no special stationery was printed for trust use. The trust officer of the trustee company conferred about every two months with representatives of the corporation. The trustee did not maintain as trustee of this trust any office, minute book or seal. The trustee rarely gave any proxies for the voting of stocks. On one occasion during the fiscal years involved a proxy was given for the purpose of voting one stock. Since the commencement of the trust in 1931 there have been purchased and deposited in trust with the trustee 2,859 shares of each of the 30 stocks named in the portfolio. In actual practice the purchase of units of stock was made approximately every 15 days. *427 The shares were held in the trustee's security vault where the securities of other trusts were held. The only sale by the trustee was of six units, or six shares of each stock, in 1934. The entire proceeds of that sale were paid over by the trustee to the investor who had requested liquidation of his interest. No new portfolio has ever been submitted by the corporation to the investors. The corporation filed a registration statement for the "Hamilton Trust Share Certificates" with the Securities and Exchange Commission and in a letter dated October 6, 1938, the Commission advised the corporation that the statement failed to meet certain requirements. Among other things the letter stated: In view of the fact that the portfolio is a fixed portfolio, requiring apparently little or no management or supervision, it appears that reference to a "management fee," without some qualification, has the capacity to mislead. It is suggested that, wherever such term is used in these items and elsewhere in the registration statement and prospectus, a statement be included to the effect that this 3/4 ths or 1% annual charge is an additional source of profit to the Depositor-Sponsor and for all practical *428 purposes constitutes an additional load. The effect on certificate holders of this charge should be clearly given, i.e., that based on income for the past several years, the effect has been that approximately 16% of all income has been paid to the sponsor in addition to the regular service charges and that such payments are determined on the basis of the net assets of the fund regardless of income. * * * * *
In view of the extent to which the Trustee acts at the direction of the Depositor-Sponsor and since its functions appear to be principally those of a custodian, it appears that the heading "Protective Provisions" and statements thereunder are misleading. The corporation also submitted certain supplemental literature to the Securities and Exchange Commission for the Commission's comment thereon. In a letter of January 28, 1942, the Commission with respect to that supplemental literature, among other things, made the following comments: 2. Referring to the last sentence of the second paragraph on page 1, we believe the statement should be clarified so as to indicate that the duties of the custodian which are prescribed in detail by the trust agreement are solely ministerial *429 and custodial in nature. The last part of the sentence can well stand alone as a separate statement. * * * * *
7. With respect to questions 8 or 9, a statement should be added to the effect that the duties of the bank as prescribed by the agreement are solely ministerial and custodial in nature and a statement to the effect that the bank does not select the common stocks or manage the investments of the plan. The investors have never held a meeting of any kind and as a group have not had officers, directors, or a governing body, or used a minute book and seal. The investors received nothing to indicate the amount of their beneficial interest in the underlying securities, save the entry in the deposit record book. No certificate representing the beneficial interest other than the Hamilton Trust Share Certificate was issued. The amount of the beneficial interest is recorded as a bookkeeping item showing the undivided interest in the underlying securities. The trust indenture provided for the assignment of Hamilton Trust Shares or certificates upon the payment of a transfer fee of $1.00. To effect an assignment the investor's assignee had to agree to carry on the payments agreed *430 to be made by the original investor if they were not completed and the assignee executed an acceptance as evidence of his intentions so to do. There was no way of transferring beneficial interests on the books of the corporation apart from the method provided by the indenture for assigning certificates. The transfer of beneficial interests in conjunction with the transfer of certificates was possible. Under the trust indenture the trustee agreed "to execute the trusts in this Agreement upon the terms and conditions herein set forth." The indenture further provided "The Trustee shall not incur responsibility or liability for any act or omission of the Corporation, and the Corporation shall not incur any responsibility or liability for any act or omission by the Trustee." The trustee was empowered in its discretion to take any action which it might deem advisable in connection with the execution of the trust, but the indenture provided "The Trustee, however, shall not be required to take any such action unless so requested in writing by the Corporation and unless indemnified as hereinafter provided." The indenture further recited with respect to "All representations and recitals contained" *431 therein that "the Trustee is in no way responsible therefor, or for any statement herein contained," and further "The Trustee shall be under no obligation to make any investigation as to any statement made in any Certificate or other document filed with it." Under its general provision the indenture recited as follows: 64. At any time that the Corporation shall decide that the Portfolio then in effect is no longer in proper balance on account of changing conditions and/or eliminations, stock dividends and split-ups, it shall have the right to prepare a new portfolio and to offer to the Investors, individually and not collectively, a new Certificate based thereon. Any investor shall have the option of turning in his old Certificate to the Corporation for cancellation and of having the Corporation transfer the credit representing his interest in the trust property, as shown by the books of the Corporation, to the newly submitted Certificate based upon the new portfolio, and the Investor's account shall be carried on under the same terms and conditions as though he still held his former Certificate and the maturity date shall be the same. 65. This Agreement may be amended or modified *432 by the Trustee and the Corporation, or their successors, by a written instrument signed by the Trustee and the Corporation and filed with the Trustee, but in no case shall the substantive rights of the Investors be affected. [ The italicized words appear in bold face type]. In actual practice an investor was permitted to liquidate his interest in the trust wholly or partially at any time he desired by notice to the corporation and the surrender of his certificate; the limitation appearing in the trust indenture restricting the right to liquidate to a period after the first 12 monthly payments had been made was never enforced. Opinion The present proceeding is so essentially similar to , affirmed (C.C.A., 2nd Cir.), , that we have no difficulty in concluding that the result reached should normally be the same. The Board there held that investment trusts of the fixed or non-discretionary type in which the managers "were not given and did not * * * exercise any powers beyond those which are necessary incidents to the preservation *433 of trust property, the collection of income therefrom, and its distribution to the holders of trust shares" are not associations taxable as corporations. Not only is that a principle to which the Board has committed itself and in which it was there upheld on review but it has subsequently reaffirmed its position in an unpublished opinion and again been affirmed by a different circuit. . A District Court in still another circuit has arrived at the same conclusion. . Such embarrassment as there is in the present proceeding arises from the circumstance that the single authority taking the opposite view is one which involves this petitioner, and which was handed down by the circuit to which the present proceeding will go for review. Hamilton Depositors Corp. v. Nicholas (C.C.A., 10th Cir.), 111 Fed. (2) 385. That case, however, i, not conclusive by virtue of any principle res judicata as is conceded, it being stated that counsel for the present parties "both *434 concluded that under the Supreme Court decision in the Nunnally case [ the point of res judicata couldn't be raised in this case." Since, however, it is in our view impossible successfully to distinguish the Chase National Bank case, it thus appears inescapable that there is a conflict. Only resort to the Supreme Court or possibly to legislation can lay the matter finally at rest. It will not improve the situation for us to follow diametrically opposite views depending upon the circuit to which an appeal will lie. And with the greatest deference to the court which decided the Hamilton Depositors Corporation case, the desirability of a shift of position on our part to conform with that result does not appear sufficiently imperative to justify the overturn of decisions of the Board which have now been affirmed in two circuits. We feel constrained, therefore, to adhere to the position adopted in the Chase National Bank case and to disapprove the deficiency on the authority thereof. Decision will be entered for petitioner.